UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAROL PERLMAN,

                          *Plaintiff*,                Docket No.:

                                          **COMPLAINT**

         -against-

GENERAL ELECTRIC, GE HEALTHCARE, H.
LAWRENCE CULP, JR., PETER ARDUINI,
FRANK JIMENEZ, BETTY LARSON and JOHN
DOES' 1-10,

                          *Defendants*.
------------------------------------------------------------X

Plaintiff, CAROL PERLMAN ("Plaintiff"), by and through her attorneys, Ballon Stoll P.C., complaining of Defendants, GENERAL ELECTRIC ("GE"), GE HEALTHCARE, H. LAWRENCE CULP, JR., PETER ARDUINI, FRANK JIMENEZ and BETTY LARSON, (collectively, "Defendants"), alleges upon personal knowledge unless where information and belief is stated, the following:

## INTRODUCTION

1.     This is an action by Plaintiff, CAROL PERLMAN ("Plaintiff"), pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.,* for benefits to which she is entitled as a participant in Defendant GE HEALTHCARE's ("GE Healthcare") Pension Plan(s) ("The Plan"), for appropriate remedial and equitable relief against the other Defendants with respect to, *inter alia,* breaches of fiduciary duty.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (a)(3). This Court has subject matter jurisdiction pursuant to ERISA §

502(e)(1), 29 U.S.C. § 1132(e)(1). This Court has supplemental jurisdiction over any other claim pursuant to 28 U.S.C. § 1367(a).

3.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 58 of the Federal Rules of Civil Procedure.

4.      Venue is based on ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

5.      In addition, this court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as this action is between a Plaintiff, a resident of New York, and Defendant, GE HEALTHCARE, a subsidiary of Defendant GE, a multinational conglomerate incorporated in New York, where the mater in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      This court has personal jurisdiction over the Defendants by virtue of their activities within this State and this District under New York Civil Practice Law and Rules Rule 301. The venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

### Plaintiff

7.      Plaintiff currently resides in New York, New York.

### Defendants

8.      Defendant GE is a multinational conglomerate with its headquarters located in Boston, Massachusetts. Defendant GE Healthcare ("GE Healthcare" or "The Company") is a wholly owned subsidiary of Defendant GE incorporated in New York and maintains its corporate headquarters in Chicago, Illinois.

9.      Defendant GE is a municipal corporation existing by virtue of the laws of the United States. GE is liable for the breach of employment contract and financial losses Plaintiff suffered.

10.     Defendant GE Healthcare is a municipal corporation existing by virtue of the laws of the United States. GE Healthcare is liable for the breach of employment contract and financial losses Plaintiff suffered.

11.     Defendant GE Healthcare is an employer within the meaning of Executive Law § 292(5), and within the meaning of New York City Administrative Code § 8-107(5). Upon information and belief, GE HealthCare employs approximately 54,000 employees throughout the United States.

12.     At all relevant times herein, Plaintiff was employed by Defendant GE Healthcare.

13.     Defendant GE Healthcare had, *inter alia,* responsibility for the interpretation and construction of the GE Healthcare Pension Plan ("The Plan") and final authority with respect to the operation and administration of the Plan, and to determine eligibility for benefits under the Plan. As such, at all times pertinent hereto, Defendant GE Healthcare was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(3)(21)(A).

14.     The Plan is an employee benefit plan(s) within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), which are subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

15.     The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

16.     Defendant H. LAWRENCE CULP, JR. ("Culp"), as the Chairman and Chief Executive Officer of Defendant GE, within the meaning of ERISA § 3(16)(A)(i), 29 U.S.C.§ 1002(16)(A)(i), and was and is a fiduciary of The Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(3)(21)(A).

17.     Defendant PETER ARDUINI ("Arduini"), as the President and Chief Executive Officer of Defendant GE Healthcare within the meaning of ERISA § 3(16)(A)(i), 29 U.S.C.§ 1002(16)(A)(i), and was and is a fiduciary of The Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(3)(21)(A).

18.     Defendants FRANK JIMENEZ ("Jimenez") and BETTY LARSON ("Larson"), by means of their employment status as corporate officers of Defendant GE Healthcare, were and/or are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(3)(21)(A).

19.     All Defendants, including Defendants John Does' Nos. 1-10, whose names are currently unknown to Plaintiff, are corporate officers of Defendants GE and/or GE Healthcare and, as part of their employment duties and responsibilities, made and/or continue to make all pertinent decisions regarding the administration of the Plan and to determine eligibility for benefits under the Plan. As such, at all times pertinent hereto, Defendants were and are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(3)(21)(A).

20.     Upon information and belief, Defendants are plan administrators for The Plan.

21.     Defendants control the distribution of funds and decide whether or not to grant benefits under The Plan. Defendants act as fiduciaries, perform discretionary benefit determinations, determine final benefit appeals, and/or otherwise exercise discretion with respect to benefit determinations.

22.    Defendants exercised all discretionary authority and control over the administration of The Plan, including the management and disposition of benefits under the terms of The Plan.

23.    Defendants provide administrative services for The Plan, which include but are not limited to pricing, reviewing claims, deciding appeals of claims and payment of claims.

24.    As the companies that issue, insure and administer employee benefit plans through which Plaintiff was employed and entitled to receive benefits, Defendants are subject to ERISA and its governing regulations.

25.    Further, due to the role Defendants played and are playing in administering The Plan, including by making coverage and benefit decisions and deciding appeals, Defendants assumed the role of a "fiduciary" under ERISA toward enrollees in the Plan, including but not limited to the Plaintiff.

## FACTS

26.    Plaintiff first joined GE Healthcare/predecessor companies in 1994. Specifically, she served as a Vice President for Corporate Communications and Public Affairs for Nycomed Inc./Nycomed Imaging, Inc., predecessor companies to GE Healthcare. See **Exhibit "A"**. Plaintiff reported directly to the President of Nycomed Inc., Daniel L. Peters, with offices based in Princeton, New Jersey.

27.    Plaintiff was a member of the North American Management Team for The Company. Her duties included, but were not limited to, creating a communication strategic agenda, consistent with the overall strategic agenda for the parent company, Hafslund Nycomed ASA, while building a new identity for the former diagnostics business of Sterling Winthrop Inc./Sanofi S.A. as Nycomed Inc. / Nycomed Imaging AS. She managed Internal and External communications including messaging, press releases, prioritized "immediate impact" publications

for potential interviews with President and key members of the executive team. She built and managed a communications support team. She also worked with the Hafslund Nycomed Director of Communications to secure global coordination of Public Relations strategy and implementation between Norway and the US to ensure the following:

1) Consistency in positioning of the business and products.

2) Successful introduction of Nycomed Inc. as the new business name/identity in the United States and new United States headquarters location (between New York City, New York and Princeton, New Jersey).

28. Moreover, Plaintiff served as the company public relations and communications representative at prominent Industry Associations, such as PhRMA, and was critical to Nycomed becoming a founding member in the Healthcare Institute of New Jersey ("HINJ"), elevating The Company to top tier, where Daniel L. Peters served on the board alongside CEOs of major pharmaceutical companies. She also developed a "Crisis Management Plan and Training Program" that was introduced and cascaded through all levels of the organization.

29. Between 1996 and 2001, Plaintiff served as Vice President, Corporate Communications and Public Affairs for Nycomed Amersham Imaging, another of The Company's predecessor companies. She again reported directly to the President, Daniel L. Peters, based in Princeton, New Jersey, with a functional interface to the Director of Corporate Affairs for Amersham Plc. Plaintiff served on the North American Management Team. Her duties and responsibilities consisted of, but were not limited to, the following:

1) Create a communications strategic agenda, consistent with the overall strategic agenda for Nycomed Amersham Imaging and the communications strategy of Amersham Plc.

2) Create a rolling communications plan, consistent with the timetable and strategic plans of Amersham Plc.

3) Coordinate and implement a global public relations strategy to ensure consistency in the positioning of the business and its products while building awareness of the new company name among internal and external stakeholders.

4) Continue in leadership positions on the Public Relations committees of prominent Industry Associations (PhRMA, HINJ) and other organizations including but not limited to medical, patient, and trade associations, to promote a better understanding of the business and advancements in diagnostic imaging, to influence positive outcomes of business development.

5) Plan, develop, and implement The Company's external trade communications, new product launches, collaborations, crisis preparedness and management programs, issues management, community relations, and government and industry relations in the Americas; and

6) Establish a multi-tiered communications program, to educate and motivate the organization, (developed and launched "InSync" monthly publication) as well as communications designed for media and customers in the adoption of a "one company" philosophy and strategy following the acquisition of the Norwegian (Nycomed) diagnostics operations by UK based Amersham.

30.     Between 2001 and 2003, Plaintiff was employed as a Vice President of Corporate Communications. She reported directly to Dr. John M Padfield (until his retirement in December, 2002). Following his departure, Plaintiff reported operationally to Peter Loescher, the successor to Dr. Padfield, and functionally to Dr. Lynne Gailey, Corporate Affairs Leader for Amersham Plc. During this time, Amersham Health was acquired by Defendant GE.

31.     Plaintiff's responsibilities included, but were not limited to, the following:

1) Directed global communications, public affairs, crisis management, public speaking opportunities, contributions, and community relations for the diagnostic imaging business unit of The Company. Repositioned Company image from that of modality-driven to disease/end benefit through creative global communications and community relations initiatives.

2) Represented The Company at government and industry trade associations (PhRMA and HINJ).

3) Managed crisis communications (training of executives) and served as spokesperson in the US and internationally.

4) Delivered high visibility placements in prominent and influential trade publications such as Pharmaceutical Executive and PHARMA VOICE, resulting in significant new business and co-venture opportunities, and increasing the visibility of the senior management team.

5) Expanded name recognition of The Company through creative strap lines and branding campaigns.

6) Launched activities designed to position The Company as a responsible corporate citizen, enhancing its visibility, and building a bank of "goodwill" in the areas in which it operated.

7) Developed strategic, creative direction and CEO perspectives for annual reports and investor presentations and worked closely with the Research and Development Division on The Company's communication strategy.

8) Liaised with the United Kingdom on acquisition communications in the United States, with a primary focus on external media relations.

9)   Prepared the President and Executive Team for media interviews, crisis response, and Industry initiatives.

10)  Continued to serve as PhRMA and HINJ communications representative, as well as related medical conferences (RSNA, SNM, ACC, etc.).

32.     Moreover, Plaintiff was responsible for all Press Releases on all Company News, Reputation Management, Crisis Communications and Crisis Training.

33.     Thereafter, Plaintiff's position was eliminated under The Company's "redundancy" policy, but Plaintiff was immediately rehired as a "contractor." Upon information and belief, under The Company's redundancy/severance programs, Plaintiff should have received redundancy severance pay and been advised as to the status of her entitlements under her pension, benefits, stock plans and other compensation in accordance with The Company's policies, procedures and guidelines in place at the time. She was never so advised. In her new role, between 2003 and 2004, Plaintiff served as the United States Communications Lead, with primarily the same duties and responsibilities. She reported directly to Daniel L. Peters, the President, and Chief Executive Officer of GE Healthcare's Medical Diagnostics division, based in Princeton, New Jersey.

**I.   Plaintiff Is Entitled to Full Benefits pursuant to the Employee Retirement Income And Security Act.**

34.     In the context of determining if an individual is an employee under the Fair Labor Standards Act of 1938, *29 U.S.C.S. § 201 et seq.,* no one characteristic is dispositive. Rather, the test is based on the totality of the circumstances. The ultimate concern is whether, as a matter of economic reality, the individual depends upon someone else's business for the opportunity to render service(s) or is in the business for himself. In short, if an individual is in business for

himself, he is not an employee; if he is economically dependent on and within the direct control of a company, he is an employee. *See Gustafson v Bell Atl. Corp., et al.,* 171 F.Supp.2d 311, 2001 U.S. Dist. LEXIS 17496 (S.D.N.Y. 2001)*; see also Preacely v. AA Typing & Resume, Inc.,* 2014 U.S. Dist. LEXIS 182946 (S.D.N.Y. 2014).

35.     Here, it is without question that Plaintiff was entirely dependent upon and within the direct control of The Company during her more than ten (10) years of continuous service to The Company.

36.     Annexed hereto as **Exhibit "B"** a true and correct copy of the March 23, 2001 "Global Communication in Nycomed Amersham Imaging", in which Dr. John M. Padfield expressly announces that Plaintiff "is appointed as VP, Corporate Communication, Nycomed Amersham Imaging". <u>See</u> **Exhibit "B".**  The document further states as follows:

> Carol Perlman is appointed as VP, Corporate Communication, Nycomed Amersham Imaging. She will report directly to myself. Carol will be responsible for managing the communication process to those parties outside our business who we must inform about who we are and what we do. She will work closely with the people in our business to facilitate the flow of news so vital to aid understanding by our customers, business partners, shareholders, and the media.
> Carol will be based in Princeton and, in addition to extensive interaction with people throughout our business, she will liaise with our corporate communications advisers and with the major industry representative associations. Carol will also work closely with our colleagues in Amersham Plc Corporate Affairs to ensure consistency of messages with the company-wide objectives and to integrate the news flow into the company's communication strategy and plans. Responsibility for the development and execution of promotional materials will remain within the marketing organization.
>
> Carol has worked for Nycomed Amersham and its predecessor companies in the USA for more than 15 years and has held a number of roles in marketing as well as in corporate communications and public affairs. She is thus very familiar with our business and our products. In her new role Carol will extend her responsibilities to address our global needs as we seek to raise the awareness of what our business can offer in the changing world of medicine, and to have our business more highly regarded in the pharmaceutical world in which we increasingly operate.

See **Exhibit "B".**

37.    Annexed hereto as **Exhibit "C"** is the position description for the post that Plaintiff assumed in 2001, Vice President for Corporate Communication, dated April 18, 2001. The document states, in pertinent part, as follows:

> By providing strategic counsel, professional support and tactical action, the VP will work to create a favorable climate for Nycomed Amersham Imaging's and Amersham Plc's future growth, consistent with the Group strategic plan.

> This position reports directly to the CEO, Nycomed Amersham Imaging, with a functional interface to the Director of Corporate Affairs, Amersham Plc. In order to ensure a seamless interface and consistent communication with the people within Nycomed Amersham Imaging, and external to Amersham Plc, the VP will also interface with the Director of People Communication, Nycomed Amersham Imaging and Head of Investor Relations, Amersham Plc respectively. The VP will attend meetings of the Nycomed Amersham Imaging Executive Committee at a frequency to be determined

> Within Nycomed Amersham Imaging, the VP will have extensive interaction with the Presidents of Medical Diagnostics and Therapy Products businesses and their management teams, as well as the Executive Vice-Presidents for Business Strategy, Product Strategy and Research & Development and also with the Presidents of our holding companies in Norway, UK and North America.

> The VP is responsible for managing the relationships with external advisers and agencies directly relating to Nycomed Amersham Imaging's corporate activities and will hold regular meetings with these parties to ensure that a communications strategic agenda and rolling communication plan are developed and implemented globally.

> Specific Responsibilities include:

>> Create a communication strategic agenda, consistent with the overall strategic agenda for Nycomed Amersham Imaging and the communication strategy of Amersham Plc.

>> Create a rolling communications plan, consistent with the timetable and plans of Amersham Plc.

>> Global coordination of PR strategy and implementation to ensure:
>> -consistency in positioning of the business and products
>> -building business image
>> -introduction of new business name/identity

Communicate the activities of the business to appropriate media.

Create a global crisis management plan and to facilitate crisis and media training of key management personnel, consistent with local needs and practices; and where appropriate, to serve as spokesperson.

Interface with the Public Relations function of (appropriate) Industry Associations and other bodies such as patient associations to enable understanding and to influence outcomes to our benefit.

See **Exhibit "C".**

38.     Annexed hereto as **Exhibit "D"** is a letter from Caroline Luscombe, the former

Executive Vice President, Human Resources at The Company. Therein, Ms. Luscombe states as

follows:

Carol Perlman was a colleague in corporate affairs in Amersham. She was the VP, Corporate Communications and worked directly for the CEO of Medical Diagnostics, Dr. John Padfield, until his departure at the end of 2002. Carol was made redundant several days prior to the announcement of GE's acquisition of Amersham back in October 2003.

In March 2020, in a discussion with a former colleague, Carol became aware that she might be entitled to a pension. Prior to this date, she had no knowledge of benefits to which she was entitled. She called GE Healthcare Affiliate Plan and was informed that she did have a pension. They were sending out information that she had to fill out and return. She never received the information. She called a second time and this time she was informed that there seemed to be an anomaly in that she was supposed to have 3 years and by their calculation certain months seemed to be missing. A third call increased the 3 years to 5 years and that started her journey to find answers. She was advised to check payroll records. The former CFO stepped in to help. The payroll records did not make sense and eventually, she contacted me.

I have spent considerable time working with Carol to try to determine what could have gone wrong so we can find a way to fix this. I have concluded that the answers are in her personnel file and whatever you can do help us find the file would be greatly appreciated. I was with Lynne Gailey, GE Healthcare Corporate Affairs Leader, when we advised Carol that she was made redundant. Although she had been working in the UK on a temporary basis, she always remained a US employee and thus, her severance, treatment of options and pension should have come directly from the US. My instruction to her at the time was that US HR would

discuss next steps with her on her return to the US. Lynne also recalls the conversation as Carol was critical to the communications efforts during this tumultuous time and continued to work on Acquisition communications with Lynne's Corporate Affairs team in the UK and the US President. Unusually, Carol was quickly moved to contractor status and never had the conversation with US HR on how her redundancy, benefits and options would be handled.

To further confuse matters, Penny Stoker, the US Head of HR at that time, relocated to the UK around the same time Carol moved to the US. Recently, I was able to speak with Penny and we confirmed that a discussion with Carol did not take place. The only thing that I can think of is that somehow, she was recorded as voluntarily leaving the company. That would basically remove her from all the important contact lists and account for Carol not receiving any communication from Amersham/GE Healthcare at that time or thereafter in respect of the treatment of options and pension.

Again, it was not until she was speaking with former colleagues in the UK that Carol became aware that she might be entitled to benefits and certainly stock options, which are still in her possession. We tried to find out who to speak with to get to the bottom of this in the US, but they have given her conflicting information about her pension vesting status, and she is struggling to get answers. Each person mentioned that unless she is aware of any "special arrangements" with the company, they could not help her.

To summarize: It is important that she is able to establish her pension rights under this scheme.

Regarding her stock options, she received options under the old Amersham plan from Sir William Castell. The stock vested 1/4 annually over 4 years. As part of her severance package (which should have been discussed with her, and it was not) she was allowed to retain her options. When GE acquired us in April 2004, these options were bought out, but Carol mysteriously never received any information nor settlement.

See **Exhibit "D".**

39.    Annexed hereto as **Exhibit "E"** is a letter addressing Plaintiff's concerns from Daniel L. Peters, dated August 20, 2021, who was Plaintiff's direct supervisor and the President and Chief Executive Officer of GE Healthcare's Medical Diagnostics division, based in Princeton, New Jersey. Therein, Mr. Peters states as follows:

It has been brought to my attention that some confusion surrounds the past employment status of Carol Perlman within GE Healthcare and its affiliates. At

this time and many years after my retirement, I am not in possession of documents with exact dates and specifics. I do know however, that in my many years as President and CEO of GE's Medical Diagnostics and its predecessor companies, Carol Perlman was either in charge of or supported the corporate communications for our business.

To the best of my knowledge, Carol was a continuous member of the management team starting in 1994. Although Carol was a contractor in the early years, arguably, she was compensated more like an employee and received many of the benefits offered to the other senior executives on the management team. Carol was provided with a company car, participated in the company's annual Management Incentive Plan (MIP), had an office and administrative support in the Princeton, NJ office, as well as everything else she needed - computers/laptop, cellphone, and office phone to perform her responsibilities.

Carol also represented the company at all industry organizations. Through her efforts, the company became a founding member of the Healthcare Industry of New Jersey (HINJ) where Carol served on several committees assisting me in my role as a board member alongside the other New Jersey based healthcare company CEOs. She was also a well-respected member of PhRMA (Pharmaceutical Research and Manufacturing Association), again assisting me in her Corporate Communication's role with Nycomed Imaging, Amersham Health and again, when she supported me in my role while President and CEO of GE's Medical Diagnostics. Over the years, with the company's multiple changes of ownership from Kodak to Nycomed to Amersham and ultimately GE, Carol continued to lead the corporate communications function within the business.

Each of the acquiring companies (Kodak, Nycomed, Amersham, GE) had different views as to whom the function should report. At times Carol would report to me as the operating business leader, while at others, Carol would report to the functional head or the corporate business group leader. In all cases Carol was totally committed to meeting the needs of the business.

In 2001, Carol became an employee as her Social Security records confirm, reporting to Dr. John Padfield, Chief Executive Officer, Amersham Health until his departure in December of 2002. Carol continued to work with his successor until he made changes to his management team. Consequently, Carol's role was made redundant, and she was moved to contractor status reporting to me through 2004.

It is my understanding that when management positions such as Carol's were eliminated prior to Amersham's acquisition by GE, it was Amersham's practice to pay severance which would have included retention of any share options. It is my sincere hope that her entire service is considered in determining her rights to pension and benefits.

<u>See</u> **Exhibit "E".**

14

40.    Annexed hereto as **Exhibit "F"** is a certified, true and correct copy of Plaintiff's records from the United States Social Security Administration, demonstrating that Plaintiff was an employee of GE Healthcare from 2000 through 2004, the time period requested by GE to verify she was an employee

41.    Annexed hereto as **Exhibit "G"** is a true and correct copy of Amersham Health 2002 Management Incentive Policy, dated May, 2002, which was addressed directly to Plaintiff by Daniel L. Peters, thus evidencing The Company's express intention for Plaintiff to be a direct beneficiary under the plan.

42.    Annexed hereto as **Exhibit "H"** is a true and correct copy of a letter from Charles L. Smith, the Director of Corporate Media Relations for Eastman Kodak Company, dated January 20, 1998. The letter is addressed to William Castell, Chief Executive Officer of Nycomed Amersham Plc, a predecessor company to The Company. Therein, Mr. Smith states that Nycomed Amersham Plc's communications strategies are "in excellent hands" with Plaintiff.

43.    Annexed hereto as **Exhibit "I"** is true and correct copy of a letter from Amersham Health to Plaintiff, dated March 7, 2002, setting forth the terms and conditions of her compensation, effective April 1, 2002, further evidencing her value to The Company.

44.    Annexed hereto as **Exhibit "J"** is a true and correct copy of an email to Plaintiff, dated December 21, 2000, from Michelle Burke, a Human Resources Employee for The Company. Therein, Ms. Burke describes and annexes thereto forms required for Plaintiff's enrollment in The Company's MIP for the year 2001, further evidencing Plaintiff's status as an employee of The Company.

45.    Annexed hereto as **Exhibit "K"** is a true and correct copy of a letter from Dr. John M. Padfield, the former CEO of Amersham Health, to Kieran Murphy, President and Chief Executive Officer of GE Healthcare. Therein, Dr. Padfield states as follows:

> However, it is as the former CEO of Amersham Health that I am writing to you now in the hope that you would personally look into a matter that has already been raised with some of your team about a personnel error that has negatively impacted a former direct report of mine. Unfortunately, there has been limited response from GE and no resolution, and so I have decided to reach out to you.
>
> I am referring to Carol Perlman who reported to me as VP, Corporate Communications from March 2001 until my retirement in December 2002. After I left, my successor, Peter Loescher made changes to the leadership team and her position was eliminated. Prior to this, Carol spent considerable time in Buckinghamshire working as an employee directly for me and the corporate communications team. Her communications role was critical to raising the profile of the diagnostics business, particularly to investors and the media, and subsequently its acquisition by GE.
>
> She was informed about her job elimination by Caroline Luscombe (former HR Leader — GE Healthcare, Bio-Sciences) and this occurred prior to the completion of the acquisition of Amersham by GE.
>
> I was quite saddened to hear that, through a series of unfortunate mistakes, Carol never received the benefits to which I believe she was and is entitled as a good leaver. When made aware in 2020 that she might have benefits, she pursued every avenue to try to establish the facts starting with a request to see her personnel file. Obviously, she appreciates all this happened a long time ago but, nonetheless, hoped that at least she would be able to access her pension records as GE took on the pension liabilities following the acquisition.
>
> In summary, when Carol returned to the US, after termination, she was supposed to have a discussion with HR in the US to review her leaving benefits; including severance, pension, and the stock options she received under the old Amersham plan from Sir William Castell.
>
> Sadly, this discussion did not happen, and at the same time, Carol was directly reemployed by the US business (reporting to Dan Peters, Head of Medical Diagnostics) as a contractor to work on communications around the pending acquisition.
>
> As she worked out of New York City where she could easily engage with US media, Carol did not spend time in Princeton, and it is my belief that the Amersham HR team in North America may have assumed, incorrectly as Caroline suggests in her

letter, that Carol left the company voluntarily. This would account for her not receiving any guidance or communication from Amersham at the time about severance payments and the treatment of her pension and stock options —nor from GE Healthcare in the months or years that followed.

I have reviewed all the information submitted by Caroline Luscombe to Katya Kruglova (Head of HR for GE Healthcare) and Kostas Korontinis (Former Head of Compensation and Benefits for GE Healthcare) and Dan Peters (former President and CEO of GE's Medical Diagnostics) and by Carol (who sent emails to you on 16 August and 1 September this year). Caroline and Dan were direct reports of mine From all of our perspectives, we believe that this was an oversight and needs to be corrected. I support them in finding resolution for Carol, and would be pleased if you would direct this to an individual who would be responsible for so doing.

For your convenience, the correspondence from Caroline and Dan is attached, together with the company announcement I released when I appointed Carol, where I reference her history with Amersham and its predecessor companies in the US for over fifteen years.

I retired before the GE acquisition, but I know that it was never my intention that Carol should be treated in any way differently from others who left the company involuntarily, a position that I am sure would be supported by Bill Castell.

Kieran, please contact me if there is anything further that I can provide. My goal is to help Carol by adding my voice to Caroline's and Dan's. The three of us have now provided the information requisite for follow up directly to Carol and lead to a successful outcome.

Thank you for your help.

<u>See</u> **Exhibit "K"**.

46.    Annexed hereto as **Exhibit "L"** is a letter from Dr. Lynne Gailey, formerly the Corporate Affairs Leader for Amersham Plc and the Global Communications Leader for GE Healthcare from 2004 until 2010. Dr. Gailey states therein that Plaintiff exited The Company as a "Good Leaver", meaning that she was entitled to full benefits which were never awarded to her, including but not limited to stock options, a pension, and other benefits. Specifically, Dr. Gailey states as follows:

My name is Dr. Lynne Gailey, formerly the Corporate Affairs Leader for Amersham Health PLC. I was the Global Communications Leader for GE Healthcare from 2004 until 2010.

The reason I write this letter is that I would like to bring to your attention a situation in need of resolution in respect to Carol Perlman, a former Vice President of Corporate Communications, among other positions and titles, of Amersham Health, PLC and its predecessor/successor companies (The Company"). In 2003, following Dr. John Padfield's retirement, she functionally reported directly to me and she operationally reported to Dr. Peter Loescher, Dr. Padfield's successor.

Throughout the many years I worked with Carol, she performed her job duties in an efficient and professional manner and was a vital member of and a thorough asset to The Company's Communications Team and Amersham Health, PLC's Leadership Team. I was with The Company when Carol left her employment and, importantly, she exited The Company as a "Good Leaver", meaning that she was entitled to full benefits when leaving The Company, including but not limited to stock options, a pension, and other benefits ("Benefits").

It has been brought to my attention that, for whatever reason, Carol was not given an "exit interview" when she left The Company and her entitlement to benefits was never explained to her either in person or in writing and said benefits were never at any time provided to her. I write this letter to assist Carol in her efforts to correct this mistake made by The Company.

I thank you for your time and attention in this matter. Should you have any questions or require additional information or materials, please contact me at your convenience.

See **Exhibit "L"**.

47.     Annexed hereto as **Exhibit "M"** are true and correct copies of Plaintiff's business cards while with The Company and a Company Directory for Nycomed Amersham, revised April 20, 2001, demonstrating Plaintiff's status with The Company during continuous employment thereat.

48.     Plaintiff was with The Company from 1994 until 2004 and is entitled to full benefits as required under the Federal Employee Income and Security Act of 1974. *See Gustafson, supra; see also Preacely, supra.*

## II.    Plaintiff Is Entitled To The Full Value Of Stock Options Accrued During Her Employment With The Company.

49.    Annexed hereto as **Exhibit "N"** is a true and correct copy of correspondence, dated May 15, 2001, from Sir William Castell, the Chief Executive of Nycomed Amersham, to Plaintiff awarding her 23,852 shares of The Company at an option price of £5.60 per share, together with supporting documents. To date, Plaintiff has not received compensation for the value of the stock options awarded to her and/or the cash value thereof as clearly said forth in said letter.

50.    Annexed hereto as **Exhibit "O"** is a true and correct copy of a letter from Sir William Castell to Plaintiff, dated April, 2002, enclosing her Share Option Certificate for options granted under the Executive Option Scheme, together with an explanatory booklet and tax guide. The Option Share Certificate annexed thereto unequivocally states that Plaintiff was granted 18,556 at the option strike price of £7.15 per share, with the vesting period from March 6, 2002 until March 6, 2006. To date, Plaintiff has not received compensation for the value of the stock options awarded to her and/or the cash value thereof as clearly said forth in said letter.

51.    As a result of the foregoing, Plaintiff is entitled to the following stock option compensation ("Stock Compensation"):

**23,852 shares at an option strike price of £5.60 per share:**

**£133,571.20**

**18,556 shares at the option price of £7.15 per share:**

**£132,675.40**

**Total: £266,246.60.**

## NEGLIGENT MISREPRESENTATION, FRAUDULENT CONCEALMENT AND TOLLING

52.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

53.     The running of any Statute of Limitations has been tolled by reason of Defendants' negligent misrepresentation and/or fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff that she was entitled to benefits and stock options as set forth herein, *supra*.

54.     As delineated conclusively herein, *supra*, and the accompanying exhibits, Defendants at all relevant times maintained strict corporate practices, guidelines and procedures regarding the award of ERISA benefits and other compensation to non-terminated employees who left The Company, such as Plaintiff. These employees were and are commonly referred to within The Company as "Good Leavers". As a result, Plaintiff was required to have an exit interview upon leaving The Company during which the ERISA benefits and other compensation that she had earned throughout her lengthy tenure at The Company would be explained to her. She was also entitled to receive documentary proof of her entitlement to benefits and detailed explanations thereof. For reasons known only to The Company, Plaintiff was not granted such an expert interview.

55.     Plaintiff was never advised by any representative of The Company that she was entitled to ERISA benefits and other compensation, was not told specifically what those benefits were nor what other compensation she was entitled to and was not provided documents detailing the types of benefits and compensation, the amount of benefits and compensation and/or the terms of benefits and compensation that she was entitled to upon leaving The Company.

56.     Defendants' conduct as set forth herein constitutes a deliberate, malicious and fraudulent attempt by Defendants to deny Plaintiff ERISA benefits and additional compensation that she had earned and was undisputedly entitled to upon leaving The Company.

57.     It was only in March, 2020, while speaking with a former colleague at The Company, Maureen Roberts, was Plaintiff made aware that she might be entitled to ERISA benefits and additional compensation that she had never received. Annexed hereto as **Exhibit "P"** is a letter written by Ms. Roberts. Therein, Ms. Roberts states as follows:

> Carol and I began working at Amersham in April 2001 in Communications, Carol in PR and myself in Internal Comms. Carol reported directly to John Padfield the CEO of Amersham Health, and I reported to Jan Ayres (who reported to John Padfield). When Jan retired, I remained in the same role and reported into the Head of HR for Amersham Health - Caroline Luscombe and Carol and I continued to work together in Communications. When John Padfield left Amersham, Carol continued to work in Corporate Affairs, until she returned to work in Princeton for Dan Peters, however we still liaised with one another and our last work meeting together was in Princeton in September 2004 and in December 2004 my internal comms role ended, and I was absorbed into the GE Comms department

> Since both leaving Amersham, we've kept in touch and meet up on a regular basis. We were supposed to meet in March 2020 but due to COVID were unable to and in a phone call were talking about the impact of the pandemic on life and I commented 'oh well at least we have our Amersham Pensions' which began a discussion about when I got mine, as Carol had not been contacted about her pension. This conversation led on to our executive stock options which were paid out to all who held them when GE officially took over Amersham.

> My process was - when my role was made redundant in March 2005, I left Amersham with 3 months' notice which I took as garden leave and then I was paid a redundancy settlement at the end of June 2005 and I was advised to pay the amount which was taxable into my pension scheme, which I did - separately I was also paid for my stock options, this process was managed by HR in the UK. Upon leaving Amersham I received regular communications from the Amersham Pension Scheme (which later became the GE Pension Scheme) advising me on fund management etc. and latterly on when I could take my pension.

In June 2020 I gave Carol the GE Pensions contact information which she contacted and also reached out to old HR contacts to identify a current HR person at GE Pollards Wood who Carol also contacted to try to trace her pension/stock options.

It's hard to envisage how this discrepancy has occurred as the Amersham HR function was very efficient, as is proved by the way my departure administration was managed. However, Carol was paid from the US but worked 50% of her time in the UK which I can vouch for as we shared an office, in the UK, perhaps this has a bearing on who took administrative responsibility for her redundancy from the company. I would also add that the demise of Carol's Amersham Health role was clumsily handled as the role was absorbed by Corporate Affairs who were serviced by Corporate HR, adding a third HR department into the equation.

See **Exhibit "P"**.

58.    Plaintiff then began a diligent effort to ascertain who she could contact to discuss these matters further with at The Company. After several attempts to identify the individuals at The Company who could assist her, she was advised to call GE Affiliate (Amersham) for Pension Verification in the US. On June 19, 2020, Plaintiff called the GE Healthcare Affiliate Plan and was informed that she did have a pension. They were sending out information that she had to fill out and return. Plaintiff never received the information. Plaintiff called a second time and this time she was informed that there seemed to be an anomaly in that she was supposed to have three (3) years and by their calculation certain months seemed to be missing. A third call increased the three (3) years to five (5) years.

59.    Plaintiff did not at any time receive the documents that the representative from the GE Affiliate (Amersham) advised she would send to Plaintiff.  The Company has, since the time Plaintiff was made redundant, been, consistently and repeatedly, negligent, deceitful, malicious, uncooperative, condescending and disingenuous during all communications with Plaintiff and/or her representatives concerning the matters raised in this action.

60.    Plaintiff has requested access to her personnel file in order to see what she was entitled to as did Ms. Luscombe, the former Executive Vice President, Human Resources at The Company, on her behalf. The Company has either refused or ignored all requests. Upon information and belief, all of Plaintiff's telephone conversations with The Company were recorded and are in The Company's possession, as are all emails from Ms. Luscombe, Daniel L. Peters and Dr. John M. Padfield.

61.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably have known or have learned through reasonable diligence, of her entitlement to benefits, stock options and other compensation, as set forth herein, *supra*.

### FIRST CLAIM FOR RELIEF
**(Failure to Provide Documents: ERISA, 29 U.S.C.S. § 1132, § 502(c)(1), 29 U.S.C § 103 (c)(1) and 29 C.F.R. § 2575.502c-3)**

62.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

63.    Specifically, pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), the Administrator of an ERISA plan is required to provide "instruments under which the plan is established or operated."

64.    Defendants failed, *inter alia,* to provide copies of documents concerning the Plan despite the fact that Plaintiff cannot calculate benefits without reference to those documents.

65.    Those documents have yet to be provided despite Plaintiff's request for these documents during her initial telephone with The Company on June 20, 2020.

66.     Pursuant to ERISA, 29 U.S.C.S. § 1132, § 502(c)(1), 29 U.S.C § 103 (c)(1) and 29 C.F.R. § 2575.502c-3, , the Court is authorized to impose a penalty on the Administrator of a plan of up to $110.00 per day for each day that the Administrator fails to provide requested documents.

67.     There is no reasonable basis for Defendants' failure to provide the documents and should be held liable as provided for under the relevant statutes.

68.     For the reasons set forth herein, *supra*, Plaintiff is entitled to benefits in amount to be determined at trial, plus appropriate interest, costs and attorneys' fees.

### SECOND CLAIM FOR RELIEF
**ERISA, ERISA, 29 U.S.C.S. § 1132, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**(Benefits Under the Terms of The Plan)**

69.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

70.     Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Plaintiffs are entitled to recovery for unpaid benefits and declaratory relief relating to Defendants' violations of the terms of their ERISA Plan.

71.     Defendants have breached the fiduciary duties they owe under ERISA by failing to pay benefits to Plaintiff without justification. Defendants therefore owe -and should be ordered to pay - the benefits due and owing to Plaintiff that were improperly denied.

For the reasons set forth herein, *supra*, Plaintiff is entitled to benefits in amount to be determined at trial, plus appropriate interest, costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF
**ERISA §§ 404(a)(1)(A), (D), 409(a) and 502(a)(2), 29 U.S.C. §§ 1104(a)(1)(A), (D), 1109(a)
and 1132(a)(2)
(Breach of Fiduciary Duty)**

72.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

73.    As a result of the foregoing, Defendants, as fiduciaries, are personally liable for damages incurred by Plaintiff as a result of her not being provided benefits as set forth herein, *supra*.

74.    Pursuant to The Plan and for the reasons set forth herein, *supra*, Plaintiff is entitled to benefits in amount to be determined at trial, plus appropriate interest, costs and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty Against all Defendants)**

75.    Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

76.    Plaintiff and Defendants entered into a valid employment agreement ("Employment Agreement") which was in full force and effect at all relevant times set forth herein, *supra*.

77.    At all relevant times, Defendants owed a fiduciary duty to Plaintiff to act in her best interest and be loyal to Defendants.

78.    Upon information and belief, Defendants breached their fiduciary duty by misrepresenting and/or modifying the Employment Agreement without Plaintiff's consent by failing to provide Plaintiff with her Stock Compensation, plus interest as set forth herein, *supra*.

79.    Defendants breached their fiduciary duty to Plaintiff, causing Plaintiff to incur expenses, including but not limited to attorneys' fees incurred in pursuing this action against Defendants.

80.    That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her Stock Compensation, plus interest, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**(Quantum Meruit/Unjust Enrichment Against All Defendants)**

81.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained by reference herein of this Complaint as though fully set forth in this paragraph of the Complaint.

82.    Plaintiff performed her services in good faith and Defendant accepted Plaintiff's services in good faith pursuant to the clear and unambiguous terms of the Employment Agreement.

83.    As a result of not advising Plaintiff of her entitlement to her Stock Compensation and/or pay her the value of her Stock Compensation, Defendants have been unjustly enriched by Plaintiff's services.

84.    It would be against public policy, equity and good conscience to allow Defendants to retain the benefits of Plaintiff's services.

85.    That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her Stock Compensation, plus interest until the present, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

## SIXTH CLAIM FOR RELIEF
**(Breach of Duty of the Covenant of Good Faith and Fair Dealing Against All Defendants)**

86.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained by reference herein of this Complaint as though fully set forth in this paragraph of the Complaint.

87.    Defendants' failure to provide Plaintiff with stock certificates and/or pay her the value of her stock compensation, plus interest rendered Defendants unjustly enriched by Plaintiff's services.

88.    Defendants have violated the implicit obligation and covenant in every contract of good faith and fair dealing by failing to provide Plaintiff with her benefits, Stock Compensation and other compensation, plus interest for the period from her last day with The Company until the present.

89.    Defendants owed a fiduciary duty to the Plaintiff pursuant to the clear and unambiguous terms of the Employment Agreement.

90.    That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her Stock Compensation and other compensation, plus interest for the period from her last day with The Company until the present, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

## SEVENTH CLAIM FOR RELIEF
**(Promissory Estoppel Against All Defendants)**

91.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained by reference herein of this Complaint as though fully set forth in this paragraph of the Complaint.

92.     Pursuant to the clear and unambiguous terms of her employment and correspondence sent by The Company to Plaintiff, Plaintiff was promised to receive, and to her detriment relied upon the promise to receive made by Defendants, her Stock Compensation, plus interest until the present, but which she was never so provided.

93.     As a result of the foregoing, Plaintiff has incurred substantial damages measured by loss of income, physical and mental anguish, pain and suffering, emotional distress, and loss of enjoyment of life.

94.     That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her Stock Compensation, plus interest until the present, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

**EIGHTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation Against All Defendants)**

95.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained by reference herein of this Complaint as though fully set forth in this paragraph of the Complaint.

96.     The above facts reveal that there existed an employer/employee relationship between the parties, which imposed a duty on Defendants to impart correct information to Plaintiff, *to wit*: that she was entitled to benefits under The Plan and Stock Compensation as set forth herein, *supra*.

97.     But that information was never imparted to Plaintiff and, as demonstrated conclusively herein, *supra*, Defendants took active measures to ensure that Plaintiff would not know of her entitlement to said benefits and monies.

98.     Plaintiff reasonably relied on the information provided by and the conduct of Defendants regarding her due compensation, thus losing hundreds of thousands of dollars, if not more, in so doing.

99.     That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her Stock Compensation, plus interest until the present, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

## NINTH CLAIM FOR RELIEF
**(Fraudulent Concealment Against All Defendants)**

100.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained by reference herein of this Complaint as though fully set forth in this paragraph of the Complaint.

101.     Defendants concealed material facts regarding her entitlement to benefits under the Plan, her Stock Compensation and additional compensation, as provided for by law and her employment status and tenure at The Company.

102.     Defendants' concealment of material information regarding her entitlement to benefits under The Plan, her Stock Compensation and other compensation was done with the intent to mislead the Plaintiff and other similarly situated employees, and Plaintiff was justified in reliance on Defendants' concealment.

103.     That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount equal to the value of her benefits, Stock Compensation and other compensation, plus interest for the period until the present, as well costs and attorneys' fees, and any other relief this Court may find just and proper.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, jointly and severally, awarding Plaintiff compensation and other damages in the form of back pay, front pay, and other monies and benefits unlawfully denied to Plaintiff, as well as for emotional distress, permanent damages to Plaintiff's emotional/mental well-being, loss of enjoyment of life, including pain and suffering, shame and humiliation:

1.    On the First Claim for Relief, judgment against Defendant in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

2.    On the Second Claim for Relief, judgment against Defendants in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

3.    On the Third Claim for Relief, judgment against Defendants in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

4.    On the Fourth Claim for Relief, judgment against Defendants in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

5.    On the Fifth Claim for Relief, judgment against in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

6.    On the Sixth Claim for Relief, judgment against in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

7.    On the Seventh Claim for Relief, judgment against in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

8.    On the Eighth Claim for Relief, judgment against in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

9.    On the Ninth Claim for Relief, judgment against in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor against the Defendants and provide the following additional relief:

10.     Unpaid benefits; and

11.     Interest on all such amounts since the time they became due; and

12.     Attorneys' fees, collection costs, and all other fees, costs and disbursements incurred in connection with this lawsuit; and

13.     Restitution; and

14.     Liquidated damages provided for under The Plan and Federal Law; and

15.     A declaratory judgment stating that Defendants are obligated to properly pay benefits due and owing to Plaintiff; and

16.     Such other and further relief, at law and equity, as the Court deems just, proper and appropriate.

<u>**JURY TRIAL DEMAND**</u>

17.     Plaintiff demands a jury trial for all claims so triable.

Dated: New York, New York
      November 17, 2022

                    BALLON STOLL P.C.

                    By:     *s/Edward M. Tobin*
                          Edward M. Tobin, Esq. (ET6592)
                          Marshall B. Bellovin, Esq. (MB5508)
                          *Attorneys for Plaintiff*
                          810 Seventh Avenue
                          Suite 405
                          New York, New York, 10019
                          212-575-7900